NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0287n.06

**No. 10-5780**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| FRONTIER INSURANCE COMPANY IN REHABILITATION, | ) ) ) | **FILED** *Mar 13, 2012* LEONARD GREEN, Clerk |
| Plaintiff-Appellee, | ) ) |  |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| RLM CONSTRUCTION COMPANY and ROBERT L. McAULIFFE, | ) ) ) | WESTERN DISTRICT OF KENTUCKY |
| Defendants-Appellants, | ) ) |  |
| v. | ) ) |  |
| BROOK SMITH, | ) ) |  |
| Defendant-Appellee. | ) |  |

Before: MARTIN, SUTTON and BALDOCK, Circuit Judges.[*]

SUTTON, Circuit Judge. The facts of this case are complicated, but the relevant law is not. The district court issued two pertinent rulings: (1) It found Robert McAuliffe and his company, RLM Construction, liable to Frontier Insurance under an indemnification agreement; and (2) it rejected McAuliffe's counterclaim for fraud against Frontier and its agent, Brook Smith, as a matter of law. McAuliffe's challenge to the indemnification ruling is moot because a later settlement

---

[*] The Honorable Bobby R. Baldock, United States Court of Appeals for the Tenth Circuit, sitting by designation.

between Frontier and a third party released McAuliffe from any liability. McAuliffe's fraud claim is barred by Kentucky's statute of limitations. We affirm.

I.

When you sign a contract, it is a good idea to know what you are signing, as this case illustrates. McAuliffe and a business acquaintance, Mark Campisano, are general contractors. McAuliffe owns one company (RLM Construction) and Campisano owns two (MC Construction and MC Management). Like other contractors, McAuliffe and Campisano often obtain project-related payment and performance bonds, which guarantee compensation to subcontractors and to the property owner if the general contractor fails to live up to its obligations. To convince insurance companies to issue the bonds, contractors often sign indemnification agreements, allowing the insurance companies to recover money from the contractors in their personal capacities in the event the contractors' companies default.

In 1992, MC Construction, along with Campisano, McAuliffe and their spouses, signed an indemnification agreement with Frontier. In 1995, the same parties (except for McAuliffe's wife), joined by RLM Construction and MC Management, signed a similar indemnification agreement with Frontier. The 1995 agreement obligated the parties to "indemnify and save [Frontier] harmless from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [Frontier] may pay or incur in consequence of having executed, or procured the execution of" payment and performance bonds for any project. R.65-10 ¶ 2. The final paragraph of the 1995 agreement specified (in all capital letters) that:

> The indemnitors hereby acknowledge that this agreement is intended to cover any bonds . . . heretofore or hereafter executed by [Frontier] on behalf of the indemnitors, or any one of them, from time to time, and over an indefinite period of years, until this agreement shall be canceled in accordance with the terms hereof.

R.65-10 ¶ 19. The agreement gave the indemnitors the right to terminate their involvement in the agreement at any time upon ten days' written notice to Frontier. R.65-10 ¶ 12. It also made clear that Frontier did not need to give notice to any of the indemnitors when one of them executed bonds covered by the agreement. R.65-10 ¶ 7. In a nutshell, the agreement put Campisano, McAuliffe and their companies on the hook for any losses resulting from bonds executed by any of them on any project with or without notice.

It did not take long for the flaws in this arrangement to come to light. In 1999, MC Management agreed to serve as the general contractor at Haverford Place, an apartment project in Georgetown, Kentucky. The contract with the property owner required MC Management to obtain payment and performance bonds, prompting Campisano to contact Brook Smith, his insurance agent, who arranged for Frontier to issue the bonds. Around the same time, Frontier drafted a new indemnity agreement—one that did not include RLM or McAuliffe as indemnitors—and presented it to Campisano. Campisano never signed the agreement, however.

The Haverford Place project encountered problems, and in December 2000 subcontractors and suppliers complained to Frontier that they were not being paid. Frontier settled the claims for $137,500 and sought indemnification under the 1995 agreement from MC Construction and RLM Construction, as well as McAuliffe and Campisano and his wife. McAuliffe protested that he and his company were not indemnitors for these bonds and had no connection to the project. Smith told

McAuliffe that the situation "would work itself out," R.89 at 7, but the project was never completed and Frontier met its obligations under the bonds. In 2002, Campisano and McAuliffe signed a separate agreement in which Campisano agreed to "indemnify and hold harmless [McAuliffe] and any of his related entities . . . from any and all losses, expenses, damages, or costs, including reasonable attorney fees," stemming from the Haverford Place project. R.145 at 2.

In November 2006, Frontier sued McAuliffe, Campisano and their companies, seeking damages under the 1995 agreement. McAuliffe filed a counterclaim against Frontier and a third-party complaint against Smith, asserting fraud and demanding that Smith indemnify *him* for any losses under the 1995 agreement. McAuliffe also sought indemnification from Campisano under their 2002 agreement. After discovery, the district court granted summary judgment to Frontier on its indemnification claim. It reasoned that the 1995 agreement remained in effect, that it made McAuliffe and RLM indemnitors and that none of Kentucky law's equitable contract defenses applied. The district court also rejected McAuliffe's fraud counterclaim against Frontier and Smith on the merits.

Campisano and Frontier settled, with Frontier agreeing to release its claims against all defendants, including McAuliffe and RLM. The district court granted McAuliffe summary judgment on his indemnification claim against Campisano and ordered Campisano to reimburse McAuliffe more than $96,000 for attorney's fees McAuliffe had incurred defending himself against Frontier's suit. The court concluded that Campisano was not responsible for attorney's fees McAuliffe incurred as a result of his counterclaim.

II.

On appeal, McAuliffe argues that the district court should not have granted summary judgment to Frontier on its indemnification claim. But the settlement between Frontier and Campisano renders that issue moot. Article III requires "a justiciable case or controversy" to exist "at all stages of review, not merely at the time the complaint is filed." *United States v. Juvenile Male*, 564 U.S. ___, 131 S. Ct. 2860, 2864 (2011) (per curiam). Even on appeal, if circumstances change such that the party seeking relief no longer can benefit from a decision in his favor, the case must be dismissed as moot. *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam).

Just so here. McAuliffe has nothing to gain from appealing the indemnification decision. After the settlement with Campisano, Frontier released all its claims, foreswearing any effort to collect money from RLM or McAuliffe. Even if we did what McAuliffe asks and reversed the district court's liability finding, he would be no better off. *Cf. United States v. Carroll*, 667 F.3d 742, 745–46 (6th Cir. 2012). The same goes for his appeal seeking indemnification from Smith. Because RLM and McAuliffe owe nothing to Frontier, there is nothing for Smith to indemnify. *See Thompson v. Budd Co.*, 199 F.3d 799, 807 (6th Cir. 1999).

The fraud counterclaim against Frontier and Smith founders on a different shoal: Kentucky's statute of limitations. It requires plaintiffs to bring fraud claims within five years of accrual, Ky. Rev. Stat. § 413.120(12), a timing prerequisite McAuliffe has not met.

A cause of action accrues when the plaintiff discovers (or with reasonable diligence should have discovered) the factual basis for his claim. *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010). McAuliffe knew of the basis for his fraud claim—Frontier's attempt to enforce the 1995

indemnification agreement against him—no later than September 2001, when an attorney he had retained wrote a letter to Frontier informing the company that McAuliffe intended to "file suit . . . for Declaratory Judgment and damages he has sustained" as a result of Frontier's conduct. R.78-6 at 1–2; *see also* R.78-7 at 2. Yet McAuliffe waited more than five years, until December 2006, to file his claim.

Even if he waited too long to file his claim, McAuliffe responds, equitable estoppel bars Frontier and Smith from invoking the statute of limitations. But that doctrine applies only when the defendant has acted in a manner "calculated to mislead or deceive and to induce inaction by the injured party." *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952); *see also* Ky. Rev. Stat. § 413.190(2). Frontier and Smith did no such thing. The only allegedly deceptive act McAuliffe points to is Smith's statement that the situation would "work itself out." R.65-34 at 102. That vague and isolated statement, expressing confidence that the matter would be resolved and nothing more, cannot excuse McAuliffe's delay in filing a claim. *See Gailor v. Alsabi*, 990 S.W.2d 597, 602–03 (Ky. 1999). That is especially true here given that nine months after Smith made the statement, McAuliffe threatened to sue—a recognition that the situation would not simply resolve itself. The statute of limitations bars the counterclaim.

### III.

For these reasons, we lack jurisdiction to consider McAuliffe's appeal except insofar as it concerns his fraud counterclaim, and on that issue we affirm.